Edward J. Hounsell v. Commissioner. Estate of Nellie Hounsell, Edward J. Hounsell, Surviving Husband v. Commissioner.
Hounsell v. Commissioner
Docket Nos. 17705, 20990, 20991.
United States Tax Court
1950 Tax Ct. Memo LEXIS 142; 9 T.C.M. (CCH) 611; T.C.M. (RIA) 50181; July 20, 1950
*142 A. D. Sutherland, Esq., Fond du Lac, Wis. for the petitioners. William A. Schwerdtfeger, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in the income tax of the petitioners and penalties as follows: Penalty
Penalty
Section
Section
Docket
294(d)(2)
293(b)
No.
Year
Deficiency
I.R.C.
I.R.C.
Edward J. Hounsell
20990
1937
$ 585.02
$ 292.51
1938
149.41
74.71
1939
341.33
170.67
1942
2,157.17
1,078.59
1943 *
848.01
17705
1944
1,581.22
1,206.08
Estate of Nellie Hounsell, Edward J.
Hounsell, Surviving Husband
20991
1936
185.76
92.88
1940
52.05
26.03
1941
609.63
304.82
1945
749.33
$133.68
1,140.97
Matters in controversy are: (1) Whether the period of limitations has run against the assessment and collection of tax for all years prior to 1944, (2) Whether the respondent has correctly determined the petitioners' taxable net income for the years 1936 through 1945, and (3) *143 Whether the returns for all the years 1936 through 1945 were false and fraudulent and made with intent to evade tax. Findings of Fact For the years 1936, 1940, 1941, and 1945 Edward J. Hounsell, sometimes referred to as the petitioner, and his wife, Nellie Hounsell, filed joint income tax returns. For the years 1937 through 1939 and 1942 through 1944 the petitioner filed his separate returns. All of the foregoing returns were filed with the collector at Milwaukee, Wisconsin. The petitioner and Nellie Hounsell were married and living together throughout the taxable years here involved and until her death on December 19, 1946. Upon her death the petitioner was appointed administrator of her estate. Although Mrs. Hounsell owned in her own name some income-producing real property and certain bank accounts, the petitioner always provided her with any funds that she needed. All property owned or held in the joint names of the petitioner and Mrs. Hounsell was acquired with funds of petitioner. The petitioner was born in January 1870 and his formal education was obtained by a few years of attendance as a young boy at an ungraded country school in the vicinity of Fond du Lac, Wisconsin. *144 After leaving the farm petitioner's first work was in the carriage trimming business in Fond du Lac. Thereafter he worked as a carpenter. In 1901 the petitioner purchased the premises located at 16 West Division Street in Fond du Lac. After remodeling the building he opened a store therein in which he sold bicycles, guns, and various types of sporting goods. The rear of the building was used by petitioner as a repair shop where guns, bicycles, and similar items were repaired. Also, keys and similar items were made. The petitioner kept the store open six days a week and until nine o'clock in the evening. He had one employee working in the store with him. The petitioner normally had a large amount of repair work to do and as a consequence spent a substantial portion of his time in the repair shop. He continued to conduct the sporting goods store business until 1947 when he sold it. During the ten years preceding 1946 the petitioner and Mrs. Hounsell had their living quarters in an apartment in the upstairs portion of the store building. At the time of the respondent's investigation of the petitioner's tax liability for the years involved herein the petitioner had no records of any *145 kind for the sporting goods store business for years prior to 1939. He did have a single entry book record for the years 1939 to 1947 which he had kept in his own handwriting. He kept no record of individual sales but at the end of the day he would enter in the foregoing book as sales the amount shown by the cash register as total receipts for the day. From time to time through oversight or inadvertence receipts from sales were not put into the cash register. Every night petitioner took the cash out of the cash register and put it into his pocket or into his safe which was located in the front portion of the building. Once or twice a week he gave Mrs. Hounsell the bank book and sums of money which she carried to the bank and deposited. Upon her return the petitioner placed the book in the safe where he kept his check book and and bank books. The petitioner was the only one who knew the combination to the safe. During the period here involved the petitioner had three bank accounts - one checking account and two savings accounts. The savings account books showed the balances at all times. On each occasion when Mrs. Hounsell returned from the bank the petitioner examined the bank *146 books to ascertain the balances to his credit but did not carry these amounts in his memory. Monthly statements of the deposits and withdrawals from the checking account and the balance remaining therein were sent by the bank to the petitioner during the period here involved. In 1915 and thereafter through the period involved herein the petitioner engaged in loaning money at interest. The loans ranged in amounts from a few hundred dollars to $4500 and in most instances were secured by mortgages. During the taxable years the number of such loans outstanding ranged between 15 and 30. The petitioner also owned a number of parcels of real estate from which he received rental income. During the taxable years the number of such properties ranged from 7 to 12. Some of the properties were sold with resulting capital gains or losses. The petitioner kept in his own handwriting a book record, in single entry form, of his rent receipts and payments of interest and principal on the loans. After the close of each year the petitioner prepared from his books on sheets of paper data respecting the income and expenses of the sporting goods store business, and rentals and interest received. He *147 took those sheets for the earlier years involved herein to Fred A. Foster, an attorney, and the sheets for the year 1940 or 1941 and later years to A. D. Sutherland, his attorney herein, for them to prepare his income tax returns. The following is a statement of the dates on which the petitioner's original income tax returns for the years 1936 through 1945 were filed and the net income reported therein: Net Income
Year
Date Filed
Reported
1936
March 15, 1937
$2,173.86
1937
March 12, 1938
1,922.32
1938
March 14, 1939
2,955.73
1939
March 15, 1940
1,608.00
1940
March 15, 1941
4,004.17
1941
March 7, 1942
2,978.80
1942
March 15, 1943
4,255.04
1943
March 7, 1944
5,325.67
1944
January 15, 1945
2,113.99
1945
January 15, 1946
2,850.07
The petitioner's aggregate bank balances increased from $34,835.81 at January 1, 1936 to $122,452.28 at December 31, 1945. The increases were as follows for the years indicated: 1936
$ 7,485.10
1937
8,045.51
1938
9,042.62
1939
3,986.68
1940
4,355.51
1941
5,022.86
1942
15,760.60
1943
9,060.75
1944
14,374.32
1945
10,482.52
Upon the death of Mrs. Hounsell on December 19, 1946 it *148 became necessary to probate her estate. She and the petitioner had no children and the petitioner was the sole heir. A large portion of the petitioner's properties was in the joint names of himself and Mrs. Hounsell. The petitioner consulted his counsel herein, advising him that he had no list of his properties either in his name alone or of the properties in the joint names of himself and Mrs. Hounsell nor of the properties of Mrs. Hounsell which were in her name alone. The petitioner and Mrs. Hounsell maintained separate papers and records with the petitioner keeping his in the safe and Mrs. Hounsell keeping hers in a box at the bank. From the public records, deeds, mortgages, bank books and the records and papers the petitioner had in his possession, the petitioner and his attorney, between December 19, 1946 and January 3, 1947 prepared a list of the properties in the joint names of the petitioner and Mrs. Hounsell as well as of the properties owned by her separately. On January 3, 1947 the petitioner, as administrator of the estate of Mrs. Hounsell, executed a "Warrant to Appraisers, Oath and General Inventory" in which was listed the personal property and real estate owned by *149 Mrs. Hounsell at the time of her death and also the personal property and real estate held jointly by her and the petitioner. The property owned by her alone was appraised at $14,525.83 for Wisconsin inheritance tax purposes. The jointly held property was appraised at $162,441.16. The inventory and appraisal was filed with the Probate Court of Found du Lac County on February 11, 1947. In the course of the preparation of the inventory filed for the estate of Mrs. Hounsell the petitioner's attorney came to the conclusion that the petitioner probably had been receiving more income than he had been reporting and told him so. Although the petitioner stated that he thought he had always reported what he had received he turned over to the attorney his books and records and instructed the attorney to ascertain the correct income and make proper reports as he (petitioner) wanted to do what was right in the matter. On the basis of his examination thereafter made of the affairs of the petitioner the attorney prepared amended returns for the petitioner for the years 1942, 1943, 1944, and 1945. On March 25, 1947 the amended returns for 1943, 1944, and 1945, executed by petitioner on the same *150 day, were mailed to the collector with check in payment of the amounts of the additional tax shown on such returns with interest thereon. The following day, March 26, 1947, the amended return for 1942, executed by the petitioner on that day, was mailed to the collector with check in payment of the additional tax shown on such return with interest thereon. In the letter transmitting the returns for 1943, 1944, and 1945 petitioner's attorney explained the additional taxes as being due to the failure of the petitioner to report the correct amount of his sales. He also stated that the petitioner was requesting an audit by the collector's office. During the first half of January 1947 James P. Flood, division chief of the collector's office for the Fond du Lac area visited Fond du Lac and learned of Mrs. Hounsell's death and the large amount of property left jointly in her name and that of petitioner. Flood assigned Arthur Gennrich, a deputy collector, to make an investigation. On February 7, 1947 Gennrich requested the collector's office to furnish him with the income tax returns filed by "Edward J. Hounsell & Nellie Hounsell" for the years 1936 through 1945, stating that he would appreciate *151 receiving the returns as soon as possible, as Mrs. Hounsell had died and left a sizable estate. On March 18, 1947, while working on another case in another town, Gennrich received the returns. During the afternoon of March 25, 1947 and after petitioner's attorney had mailed the amended returns for 1943, 1944, and 1945, Gennrich called at the office of the petitioner's attorney, stated that he understood the attorney represented the estate of Mrs. Hounsell and that he had come to investigate her income tax returns. The attorney pointed out that Mrs. Hounsell left a small estate and that there was no problem with respect to her income tax, but that there was a real problem with respect to the petitioner's income tax. The attorney further advised Gennrich as to the petitioner's income tax situation and the filing of amended returns and as to how they had been prepared. Although Gennrich stated that his file covered only the matter of Mrs. Hounsell he took with him the petitioner's bank statements, stating that he would work on them first. On April 4, 1947 Gennrich made a report to Flood. In that report Gennrich listed certain amounts as the income reported by petitioner and Mrs. Hounsell *152 for the years 1941 through 1945, set out the amounts of the petitioner's bank balances at the close of the years 1935 through 1946, pointed out that amended returns had been filed and recommended that the case be referred to the Intelligence Unit of the Bureau. The report does not indicate that Gennrich in any wise attempted to ascertain the correct income of either the petitioner or Mrs. Hounsell for any of the years. The following is a statement of the net income reported on the above-mentioned amended income tax returns for the years 1942 through 1945: Net Income
Year
Reported
1942
$10,963.17
1943
15,282.68
1944
6,696.89
1945
8,103.51
The following is a statement of the total receipts and net profit or loss from the sporting goods store business as reported by the petitioner in the original returns and in the amended returns: Original Returns
Amended Returns
Total
Net Profit
Total
Net Profit
Year
Receipts
or (Loss)
Receipts
or (Loss)
1936
$ 6,765.65
($ 661.95)
1937
9,081.14
( 1,225.15)
1938
9,010.71
( 43.22)
1939
9,140.74
( 120.28)
1940
8,662.06
1,680.29
1941
9,198.25
521.88
1942
16,373.65
1,550.63
$22,983.45
$ 8,160.43
1943
10,458.03
2,194.83
20,361.95
12,098.75
1944
8,967.52
( 225.86)
13,192.69
3,999.31
1945
8,557.16
( 1,165.59)
14,385.24
4,562.49
*153 Beginning on July 15, 1947, G. J. Gjertson, a deputy collector, made an audit of the petitioner's book record for his sporting goods store business and of his mortgage book for the taxable years 1939 through 1946. To the income reflected by these books Gjertson added bank interest, dividends, and rental income as shown in the original returns. The income thus computed materially exceeded the income shown on the original returns for the respective years except the year 1940. No audit was attempted for years prior to 1939 since the petitioner had no records of his sporting goods business for such prior years. Since the petitioner's principal source of income involved sales and as it was not feasible to verify the sales set forth in his store record by attempting to contact customers, Gjertson prepared a statement of the petitioner's net worth at the close of each of the years 1935 through 1946. In preparing that statement he made allowance for depreciation on depreciable property, made adjustment for the non-taxable portion of capital gains and the non-deductible portion of capital losses and added federal taxes paid, gifts and estimated amounts for living expenses of the petitioner *154 for the respective years. The respective annual increases as thus computed by Gjertson were determined by the respondent as the net taxable income of the petitioner for the respective years, and were used by him in determining the deficiencies here involved. The amounts of income thus determined by respondent were as follows: 1936
$ 6,971.97
1937
10,970.23
1938
6,497.87
1939
7,970.32
1940
5,587.32
1941
7,250.58
1942
11,572.99
1943
10,445.41
1944
10,000.40
1945
10,225.59
In arriving at the above amounts reductions in net worth of $83.80 for 1938 and $1,448.14 for 1945 were made as representing the nontaxable portion of capital gain for those years and additions of $228.64 for 1944 and $78.75 for 1945 were made as representing the non-deductible portion of capital losses for those years. Additions also were made in the amounts of $14.41 for 1939, $92.59 for 1941, $135.97 for 1942, $1,352.71 for 1943, and $118.08 for 1945, which represented the amount of federal income tax paid in the respective years. During 1945 the petitioner actually paid $378.04 as income taxes but during that year $259.96 of the amount paid during 1943 was refunded, thus leaving *155 the net amount of $118.08 for 1945. In the joint returns filed by petitioner and Mrs. Hounsell for 1936, 1940, 1941, and 1945 her net income was shown as $111.52, $202.13, $72.52, and $285.01 for the respective years. Additions of said amounts were made in the respective years in the computation of the taxable net income for such years as determined by the respondent. In the taxable net income as determined by the respondent an amount of $700 was included for each of the years 1936 and 1937 as the estimated amount of the living expenses of petitioner and Mrs. Hounsell for those years. In each of the years 1938 and 1939 an amount of $800 was included for such purpose while $900 was included for that purpose in each of the years 1940 and 1941 and $1,000 was included for that purpose in each of the years 1942 through 1945. In addition to maintaining the apartment over the store occupied by him and Mrs. Hounsell the petitioner had a house at a lake about four miles from Fond du Lac. The house was heated by a coal burning furnace and had a scant amount of plumbing in it but had no telephone. The petitioner had a garden at his lake place which he worked when he went out on week-ends. *156 The petitioner raised in, and Mrs. Hounsell canned from, the garden all the vegetables that they needed. The petitioner also raised chickens at the lake. He fished and hunted ducks around the lake. Those were the only sports he engaged in. Neither petitioner nor Mrs. Hounsell took any pleasure trips. On January 23, 1937 the petitioner traded a 1926 Willis automobile for a new 1937 four-door sedan Chevrolet automobile, which he thereafter continued to own throughout the last of the taxable years here involved. In traveling around Fond du Lac the petitioner rode his bicycle a great deal of the time. Neither the house at the lake nor the apartment over the store was rented when not occupied by petitioner and Mrs. Hounsell. In the aforementioned statement of net worth prepared by Gjertson there was included at an amount of $2,000 at the beginning and end of each of the taxable years involved herein lots Nos. 35 and 36 situated at Long Beach in Fond du Lac County. These lots were acquired by the petitioner on August 30, 1926, and, so far as shown, without cost to him. Thereafter and prior to 1932 the petitioner expended about $500 on the lots in removing brush therefrom and in filling *157 in around the lake. Whether the expenditure related primarily to one lot or equally to both is not disclosed. The petitioner sold one of the lots in 1932 for $175 and in 1936 he sold the other for $800. The sale of the lot in 1936 was not reported in the petitioner's income tax return for that year. On November 1, 1937 the petitioner acquired by assignment for $1800 a mortgage given by Georgene C. Duffie. The records of the Registrar of Deeds of Fond du Lac County show this mortgage as having been satisfied on April 2, 1938. The petitioner's mortgage book records the foregoing acquisition of the mortgage, shows payments made of current interest thereon on March 31, 1939, October 16, 1939, and December 20, 1939, and the payment of the principal thereof, $1800, on the latter date. In the statement of net worth prepared by Gjertson the mortgage was treated as having been paid in 1939. On December 23, 1939 Julia B. Spieckerman executed a mortgage to the petitioner to secure an obligation of $1800. The records of the Registrar of Deeds of Fond du Lac County show this mortgage was cancelled of record on December 2, 1940. The petitioner's mortgage book records the acquisition of the foregoing *158 mortgage, shows payments of current interest thereon in each of the years 1940 to February 17, 1945 and the payment of the principal of $1800 on the last mentioned date. In the statement of net worth prepared by Gjertson the mortgage was treated as paid in 1945. In April 1930 the petitioner loaned Ludwig and Mabel Karl $3000 secured by a mortgage on premises known as 481 East First Street in Fond du Lac. Thereafter Karl ceased paying taxes on the property and became delinquent in the payment of the interest on the mortgage. The petitioner brought foreclosure proceedings and on April 5, 1940 acquired title to the property, which consisted of lots Nos. 5 through 18 in Block B of Spenser's Addition to the City of Fond du Lac. The cost to the petitioner of the property was the $3000 loaned in 1930, delinquent taxes of $537.28 and expenses of foreclosure and clearing title $156.50, or a total of $3,693.78. On April 5, 1940 the petitioner executed a quitclaim deed to Mrs. Mabel Karl for lot No. 6 of the above-mentioned lots. The recited consideration to the petitioner for the lot was $1 and other valuable consideration. On March 18, 1944 the petitioner sold, under a land contract, to Mrs. *159 Karl the remaining portion of the premises at 481 East First Street for a consideration of $3000, of which $400 cash was paid. The unpaid portion was payable at the rate of $30 per month and was to bear interest at the rate of 5 per cent per annum. The petitioner's mortgage book shows eight payments of $30 each, or a total of $240 between the date of sale and the end of 1944. The book also shows two interest payments in 1944, the last being $65 on December 4, 1944. The book shows eight payments of $30 each or a total of $240 made in 1945 through July 30, and a payment of interest to May 1, 1945 of $58.00. The book also contains an entry purporting to be under date of August 3, 1944 indicating the receipt of a check for $2,173 in payment of principal. On some undisclosed date in August 1945 and at the request of Mrs. Karl petitioner executed a warranty deed to the Congregation of St. Agnes, a Wisconsin corporation, for the property covered by the land contract. A schedule attached to the petitioner's 1944 income tax return filed on January 15, 1945 showed the sale of the 481 East First Street property. The selling price was shown as $3000 payable $30 monthly for 100 months and the *160 cost was shown as $3537. The schedule indicated that nine monthly payments had been made and a loss of $37.46 was computed as applicable to 1944. One-half of that amount, $18.73, was shown in the return as a capital loss from the sale of the property. In the two subsequent returns filed by the petitioner for 1944 the capital loss continued to be shown as $18.73. In his 1945 income tax return filed on January 15, 1946 the petitioner listed no capital gain or loss as applicable to 1945 with respect to the sale of the 481 East First Street property sold in 1944. However, in a schedule attached to the return he reported a gain of $700 from the sale in 1945 of a parcel of real estate acquired in 1935 and not in controversy here. He also reported a loss of $150 from the sale of real estate at "571 2nd St." which was shown as having been acquired in 1944 at a cost of $3,150 and sold in 1945 for $3,000. The net capital gains was shown as $550 and one-half of that amount was included as taxable. In the two subsequent returns filed by the petitioner for 1945 the capital gain continued to be shown as $550. In his investigation of the petitioner's 1945 return Gjertson found that there was *161 no such address as 571 2nd Street. He found from the public records that during 1945 the petitioner executed a deed to the property covered by the land contract with Mrs. Karl. After checking with Mrs. Karl and being informed by her that she completed payment of the land contract in 1945, Gjertson concluded that the reported sale of 571 2nd Street property was in error and that the reference was probably intended to be to the property covered by the land contract. On the basis of the foregoing Gjertson included the 481 East First Street property in the aforementioned statement of net worth at an amount of $3,537.28 at the end of each of the years 1940 through 1943. The land contract with Mrs. Karl was included in the statement of net worth at the end of 1944 as a receivable in the amount of $2,330. That amount was computed by subtracting from the selling price of $3,000, the down cash payment of $400 and monthly payments of $30 for nine months. The following is a statement of the tax shown by the petitioner on the original (first) returns filed by him, the tax liability shown on the amended returns (filed in 1947), the correct tax liability as determined by the respondent, and *162 the total tax paid by the petitioner for the indicated years. Tax
Tax shown
Tax shown
determined
Total
on original
on amended
by
tax
Year
return
return
respondent
Paid
1936
None
$ 185.76
None
1937
None
585.02
None
1938
$ 14.41
163.82
$ 14.41
1939
None
341.33
None
1940
98.40
144.64
92.59 [4]
1941
135.97
745.60
135.97
1942
586.57
$2,473.70
2,743.74
586.57
1943
1,092.75
5,243.63 [1]
2,642.11
4,657.06
1944
371.19
1,213.16 [2]
2,755.15
1,232.96
1945
431.96
1,910.60 [3]
2,659.93
1,910.60
*163 The deficiency notice in Docket No. 17705 was mailed on March 5, 1948, and those in Docket Nos. 20990 and 20991 were mailed on September 27, 1948. The petitioner's returns for the years 1936 through 1945 were not false and fraudulent and made with intent to evade tax. Opinion Finding that the petitioner's books and records failed to disclose income for the respective taxable years involved herein comparable to the increases in his net worth for such years, the respondent has used the amount of such increases in net worth in determining the petitioner's taxable net income and the deficiencies for the respective years. Although taking exception to the respondent's treatment of certain items involved in the computation of net worth, the petitioner does not contest the respondent's use of the increase in net worth method in ascertaining taxable income. From our consideration of the record we think the respondent's use of that method was amply justified. The petitioner contends that the increase in net worth computations are erroneous for all years in that lots Nos. 35 and 36 in Long Beach were included as assets in the amount of $2,000 at the beginning and end of the respective *164 taxable years when in fact the petitioner had sold one of the lots in 1932 and sold the other in 1936. While we have found that the lots were sold as the petitioner contends, their inclusion at an amount of $2000 at the beginning and end of the years following 1936 would have no effect on a computation of the petitioner's increase in net worth for those years since the inclusion of the same amount at the beginning and at the end of the year would cause the amounts to offset each other. The inclusion of the $2000 at the beginning and end of 1936 when the last of the lots was sold in 1936 would call for some adjustment of the 1936 increase in net worth. However, since we conclude that the period of limitations has run against the assessment of any tax liability for 1936 and since the evidence as to petitioner's basis for the lot sold in 1936 is indefinite, we do not deem it necessary to consider what adjustment should be made to the income as determined by the respondent for that year. On December 23, 1939 Julia B. Spieckerman gave the petitioner a mortgage to secure an obligation of $1800. While the records of the Registrar of Deeds of Found du Lac County show that the mortgage was *165 cancelled of record on December 2, 1940 the petitioner's mortgage book shows payments of current interest on the mortgage in 1940 and each of the subsequent years to February 17, 1945 and the payment of the principal of $1800 on February 17, 1945. In the respondent's computations of the petitioner's increases in net worth the mortgage was treated as an asset from the time it was given in 1939 until February 17, 1945 and the latter date was treated as the date of payment of the principal. The record is silent as to why the mortgage was cancelled of record in 1940, or why, if it was paid at that time as the cancellation would imply, the mortgagor continued thereafter to make payments of current interest in subsequent years and paid the principal of the mortgage in 1945 as indicated by the petitioner's book record. Furthermore, the record is silent as to why, if payment of the mortgage was made in 1940, entries to the contrary continued to be made in the petitioner's books for more than four years. In the situation presented we are unable to hold that the respondent's action in treating the mortgage as having been paid in 1945 was erroneous. A similar holding is applicable with respect *166 to the mortgage given by Georgene C. Duffie which was acquired by the petitioner in November 1937, satisfied of record on April 2, 1938 and as to which the petitioner's book record discloses payments of interest in three dates in 1939, including one on December 30, 1939 when payment of the principal is shown to have been made. The respondent included the land contract of Mrs. Karl as an asset in the amount of $2330 in computing the petitioner's net worth at the end of 1944. This amount was computed by reducing the original amount of the contract, $3000, by the down cash payment of $400 and by $270 as representing nine monthly payments of $30 each. The petitioner contends that the respondent's inclusion of the contract in net worth at the end of 1944 was erroneous because his mortgage book shows two payments on the contract in 1944, one of $400 and another of $2173, or a total of $2573 and that the balance of the contract, $427, was paid in 1945. This contention of the petitioner cannot be reconciled either with his mortgage book or with the three income tax returns filed by him for 1944. As set out in our findings of fact, petitioner's book contains an entry purporting to be under *167 date of August 3, 1944 showing a payment of $2173. If such an amount had been paid on that date then that amount plus the $400 down cash payment plus the four monthly payments of $30, or a total of $120, as shown by the books paid prior to August 3, 1944, would make total payments of $2693 to August 3, 1944 leaving only $307 due on the contract. Interest on the latter amount for an entire year at 5 per cent, the rate provided in the contract, would be $15.35. However, the book shows a payment on December 4, 1944 of "Interest 6 month 65.00" and a payment on May 29, 1945 of "Interest to May 1 59.00". Obviously no such interest payments would have been warranted if $2173 had been paid on August 3, 1944. The petitioner's 1944 returns contain nothing to indicate a payment of $2173 in 1944. At most they indicate the receipt in 1944 of only nine monthly payments, the number of monthly payments used by the respondent in computing the payments made in 1944. From the evidence presented we are unable to find that the respondent erred in his treatment of the land contract. In the taxable net income as determined by respondent there was included an amount of $700 for each of the years 1936 and *168 1937 as the estimated amount of the living expenses of the petitioner and Mrs. Hounsell for those years. An amount of $800 for such purpose was included in the taxable net income for the years 1938 and 1939. The amount included for such purpose for 1940 and 1941 was $900. For the years 1942 through 1945 the amount of $1000 was included. The petitioner contends that not more than $700 per year should have been included on account of living expenses because he and Mrs. Hounsell lived largely on their garden and chickens. The evidence shows that petitioner's garden at the lake produced all the vegetables he and Mrs. Hounsell needed and that they also raised an undisclosed number of chickens at the lake. While a fair conclusion from the evidence is that petitioner and Mrs. Hounsell lived frugally it may not be further concluded that approximately the amounts included by the respondent were not actually expended for living purposes. The fact that petitioner and Mrs. Hounsell did not live lavishly or luxuriously standing alone does not establish or indicate just what amount was expended. Since the issue on this point relates solely to the amount expended and finding no basis of record *169 for holding that lesser amounts than those included by respondent were actually expended we sustain the respondent. Although not having made claim in the petitions for any overpayment and also not having assigned any error with respect to the manner in which the collector applied certain sums forwarded to him by the petitioner, the petitioner makes some argument on brief about the collector's application of a portion of the sums. Petitioner contends that an amount of $754.58 which was paid in 1947 and applied by the collector as interest on income tax for 1943 should be applied as a credit in part against additional taxes due for 1944 and in part against additional tax due for 1945. In connection with issues raised as to the petitioner's income for the respective years involved herein and the penalties asserted with respect thereto the parties submitted a stipulation as to assessments, payments, credits and refunds of the income taxes and interest of the petitioner for said years from which we made our findings as to the amount of tax paid by the petitioner in and for each year. Since the pleadings present no issue with respect to the manner in which the collector made application, *170 as between taxes and interest, of the various sums forwarded to him no consideration can be given to this issue which was raised for the first time on brief. John Gerber Company, 44 B.T.A. 26. In this connection it is observed that for 1943 the respondent has determined a deficiency only penalty and has determined an overassessment in income tax. Consequently, our jurisdiction as to 1943 is limited solely to such matters as relate to the deficiency in penalty. The respondent contends that the petitioner's returns for the years involved herein were false and fraudulent and were made with the intent to evade tax. In support of his contention he points to the substantial differences between the amounts of income reported in the petitioner's original income tax returns and the amounts determined by the respondent for said years by the use of the increase in net worth method. The respondent urges that the record furnishes no plausible reason or excuse for these understatements by the petitioner and that petitioner's action in this respect shows a consistent and intentional effort to understate his income throughout the ten-year period. The respondent further contends that *171 it was not until after the petitioner and his attorney learned that an investigation was being made of the petitioner's tax liability that the attorney prepared and the petitioner filed amended returns for the years 1942 through 1946. The petitioner contends that he made his original returns from his books, that it was not until 1947 when he first made a list of his various assets that he learned that his books did not show all of his income and that he thereupon had his attorney prepare amended returns which were voluntarily filed in an effort to discharge his full tax liability. He urges that in view of this and since there was no concealment of assets at any time, and that since he assisted the Bureau representatives in every way he could in making the investigation we should find that he has acted in good faith throughout and did not file his returns with fraudulent intent and for the purpose of evading tax. He also points to the lack of any evidence showing that Mrs. Hounsell kept records for him or furnished any data for the income tax returns except as related to her own income which the respondent accepted without change in determining the deficiencies involved herein. *172 The record presents the case of one who with little formal education, but with considerable industry and frugality, accumulated a substantial competency over a period of approximately half a century and who during that time established a reputation for honesty and fair dealings. While his books were inadequate for the purpose of a correct reporting of income, they did, in our opinion, represent an honest effort on the part of petitioner to record his business transactions from day to day. A great number of his errors were errors in simple arithmetic, many of them being errors in the addition of page entries covering many small items. They were not errors of the character that would be found in the books of a man who intended to deceive or mislead anyone who might thereafter examine his records, or of a man who intended to cover up the true results of the transactions recorded. In short, we do not believe that petitioner recognized the inadequacy of his books. The evidence shows that when his attorney informed him that apparently he had not been reporting all of his income, the petitioner instructed the attorney to take the necessary action to correct the situation. Both petitioner *173 and his attorney cooperated fully with the representatives of the Bureau in their examination of the petitioner's affairs. While it appears that an investigation of the petitioner's tax liability was initiated early in 1947 it progressed little beyond that stage until after petitioner had filed amended returns. So far as we can determine neither the petitioner nor his attorney was aware of any steps taken toward an investigation until on March 25, 1947 and after amended returns for 1943 through 1945 had been filed and an amended return for 1942 had been prepared. Consequently we are unable to find, as the respondent contends, that the amended returns were not filed until after the petitioner and his attorney learned that an investigation was being made. So far as shown the amended returns were filed voluntarily. The total net income reported in the amended returns for the four years approximated the total net income determined by the respondent for said years. The petitioner appeared and testified at the hearing in this proceeding. At that time he was approaching 80 years of age. It was obvious that with his advancing years his memory was failing. Because of this condition he was, *174 in a number of instances, unable to recall anything as to matters about which he was asked. As to such matters as his memory served him his testimony was direct and frank and given without equivocation. The impression made by him was that of one who sought to, and would, do what was correct and proper to the best of his ability and discernment. From our consideration of the evidence we have concluded and found as a fact that the petitioner's returns were not false and fraudulent and made with intent to evade tax. Since the petitioner's returns were not false and fraudulent the period of limitations within which deficiencies in tax might be determined had expired at the time of the mailing of the deficiency notices for all the years except 1944 and 1945. Decisions will be entered under Rule 50. Footnotes
*. An overassessment in income tax of $2,014.95 was determined for 1943.↩
4. The petitioner paid $98.40 on March 15, 1941 but $5.81 of that amount was refunded to him in October 1941.↩
1. On March 26, 1947 the petitioner filed an amended return for 1943 showing a total income and victory tax of $5,035.70. On April 15, 1947 the petitioner filed another amended return for 1943 showing a total income and victory tax of $5,243.63. ↩
2. On March 15, 1945 the petitioner filed an amended return for 1944 showing a tax of $343 and requested that the difference between that amount and the tax shown on his original return for 1944, or $28.81, be credited on his 1945 estimated tax. ↩
3. On February 14, 1946 the petitioner filed an amended return for 1945 showing a tax of $378 and requested that the difference between that amount and the tax shown on his original return for 1945, or $53.96, be credited on his 1946 estimated tax. ↩